Gayle KING, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–03–028–CR.

Court of Appeals of Texas, Corpus Christi–Edinburg.

Aug. 18, 2005.

Rehearing En Banc and Rehearing Overruled Nov. 10, 2005.

---

Joseph A. Connors, III, McAllen, for appellant.

Rene A. Guerra, Criminal Dist. Atty., Theodore C. Hake, Asst. Criminal Dist. Atty., Edinburg, for appellee.

Before Justices RODRIGUEZ, CASTILLO and GARZA.

1. *See* TEX. BUS. & COM.CODE ANN. § 17.461 (Vernon 2004).

2. *See* TEX. PEN.CODE ANN. §§ 31.03, 31.01(3)(A) (Vernon 2004–05).

## OPINION

Opinion by Justice CASTILLO.

A jury convicted appellant Gayle King of two counts of promoting a pyramid promotional scheme [1] and one count of theft by deception.[2] The jury acquitted her of five other indicted charges. The trial court sentenced King to three concurrent sentences of two years in a State Jail facility, probated for five years, imposed a fine, and ordered restitution. King raises eight issues on appeal. We affirm.

## I. BACKGROUND

In late 2000, a program referred to as Women Helping Women ("WHW"), Original Dinner Partyr ("ODP"), or "birthday club" became popular as a "gifting club." Women who wished to join WHW would pay $5,000 for a "plate," designated as a "gift," with the expectation that their $5,000 gift would be returned to them, multiplied, as other women joined the club and paid the $5,000 gift.[3] King's adverse jury verdict rested on two counts of a pyramid promotional scheme and one count of theft.

## II. ISSUES PRESENTED

By her eight issues, King complains: (1) the trial court reversibly erred in denying her requested jury charge instruction on a defensive issue; (2) restitution is unsupported in law or fact; (3) section 17.461 of the Texas Business and Commerce Code is unconstitutional; (4) the evidence is legally insufficient; (5) prosecution was selective; (6) the jury charge omitted a requisite knowledge element; (7) the double jeopar-

3. The complainant, Bartolita Torres, testified, "Well, when you first give your money, they put you down right here, the soup and salad. If you bring other people in, they push you up to-until you get to entree. If you bring more people in here, you get to the dessert and party."

dy clause barred the punishment assessed; and (8) her motion for new trial should have been granted.

### III. LEGAL SUFFICIENCY

By her fourth issue, King asserts that the evidence is legally insufficient to prove the essential elements of (1) a pyramid scheme in Counts 1 and 2, and (2) theft in Count 5. The State counters that the evidence is sufficient to sustain the convictions.

### A. Legal Sufficiency Standard of Review

A legal-sufficiency challenge requires us to review the relevant evidence in the light most favorable to the verdict, and then to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Escamilla v. State*, 143 S.W.3d 814, 817 (Tex. Crim.App.2004) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *see Swearingen v. State*, 101 S.W.3d 89, 95 (Tex.Crim.App. 2003) (en banc); *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App.2000) (en banc). This standard is designed to give "full play to the [jury's] responsibility fairly" to "draw reasonable inferences from basic facts to ultimate facts." *Sanders v. State*, 119 S.W.3d 818, 820 (Tex.Crim.App.2003). We consider all the evidence that sustains the conviction, whether properly or improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex.Crim.App.2001) (cit-ing *Garcia v. State*, 919 S.W.2d 370, 378 (Tex.Crim.App.1994) (en banc)). Similarly, we consider all the evidence that sustains the conviction, whether submitted by the prosecution or the defense, in determining the legal sufficiency of the evidence. *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim. App.2000) (en banc); *Cook v. State*, 858 S.W.2d 467, 470 (Tex.Crim.App.1993) (en banc). In this review, we are not to re-evaluate the weight and credibility of the evidence; rather, we act only to ensure that the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim.App.1993) (en banc).

The legal sufficiency of the evidence is measured against the elements of the offense as defined by a hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997).[4] This standard of legal sufficiency ensures that a judgment of acquittal is reserved for those situations in which there is an actual failure in the State's proof of the crime, rather than a mere error in the jury charge submitted. *Id.* We then determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *Johnson*, 23 S.W.3d at 7.

■ If we reverse a criminal case for legal insufficiency, we reform the judgment of conviction to reflect conviction for a lesser offense only if a jury charge on the lesser offense was either submitted or

---

**4.** A hypothetically correct charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict its theories of liability, and adequately describes the particular offense. *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App.1997); *Cano v. State*, 3 S.W.3d 99, 105 (Tex.App.-Corpus Christi 1999, pet. ref'd). A hypothetically correct jury charge does not simply quote from the controlling statute. *Gollihar*

*v. State*, 46 S.W.3d 243, 254 (Tex.Crim.App. 2001). Its scope is limited by the statutory elements of the offense as modified by the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex.Crim.App.2000). *Malik* flatly rejects use of the jury charge actually given as a means of measuring sufficiency of the evidence. *See Gollihar*, 46 S.W.3d at 252. *Malik* controls sufficiency of the evidence analysis even in the absence of alleged jury charge error. *Id.* at 255.

requested, but denied. *Collier v. State*, 999 S.W.2d 779, 782 (Tex.Crim.App.1999). Otherwise, we vacate the judgment of conviction for legal insufficiency and order a judgment of acquittal. *Swearingen*, 101 S.W.3d at 95.

## B. Pyramid Promotional Scheme

### 1. The Law

■ "Pyramid promotional scheme" means a plan or operation by which a person gives consideration for the opportunity to receive compensation that is derived primarily from a person's introduction of other persons to participate in the plan or operation, rather than from the sale of a product by a person introduced into the plan or operation. TEX. BUS. & COM.CODE ANN. § 17.461(a)(6) (Vernon 2002). "Promoting a pyramid promotional scheme" means (1) inducing or attempting to induce one or more other persons to participate in a pyramid promotional scheme, or (2) assisting another person in inducing or attempting to induce one or more other persons to participate in a pyramid promotional scheme, including by providing references. TEX. BUS. & COM. CODE ANN. § 17.461(a)(5)(A)-(B) (Vernon 2002). "Compensation" means payment of money, a financial benefit, or another thing of value. TEX. BUS. & COM.CODE ANN.

§ 17.461(a)(1) (Vernon 2002). The term does not include payment based on the sale of a product to a person, including a participant, who purchases the product for actual use or consumption. *Id.* "Product" means a good, a service, or intangible property of any kind. TEX. BUS. & COM. CODE ANN. § 17.461(a)(4) (Vernon 2002).

### 2. The Record

Counts 1[5] and 2[6] charged King with a pyramid promotional scheme, alleged to have occurred, respectively, on or about October 19, 2000, and November 2, 2001.

#### a. The State's Witnesses[7]

Sandra Garcia testified that, in late 2000, she became involved with WHW after speaking with her friend, Bartolita Torres. On October 19, 2000, she attended what she thought was a WHW meeting at a residence. Instead, the event was a "gifting party," which Garcia described as "several persons give money to one person and it comes out to either 10 or 20,000." King and two other women received $20,000 in cash each. Garcia signed her name on a list which was passed around for attendees who wished to participate in the future. From Garcia's perspective, King was in charge because she did most

---

**5.** As to Count 1, the indictment alleged that, on or about October 19, 2000, King intentionally and knowingly did contrive, prepare, establish, operate, promote, advertise and sell a pyramid promotional scheme, namely, a plan and operation by which Bartolita Torres gave consideration of $5,000 in United States currency for the opportunity to receive compensation that was derived primarily from a person's introduction of other persons to participate in the plan and operation, rather than from the sale of a product by a person introduced into said plan and operation.

**6.** As to Count 2, the indictment alleged that, on or about November 2, 2001, King intentionally and knowingly did contrive, prepare,

establish, operate, promote, advertise and sell a pyramid promotional scheme, namely, a plan and operation by which Bartolita Torres gave consideration of $2,500 in United States Currency for the opportunity to receive compensation that was derived primarily from a person's introduction of other persons to participate in the plan and operation, rather than from the sale of a product by a person introduced into said plan and operation.

**7.** Based on King's legal sufficiency challenge, we review the evidence in the light most favorable to the verdict. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

of the talking. Using a diagram on an easel to demonstrate the process, King explained that $2,500 was for half a "plate" and $5,000 for a whole "plate," and, "then as people come in, you move out or up . . . til you get to the dessert plate and that's when you party." [8] From King's talk, Garcia understood that, within four to six weeks, in return for $2,500 in cash, the person would receive $10,000; similarly, for $5,000, the person would receive $20,000, provided additional persons participated. Garcia testified, "We were told that we didn't have to take anybody. We didn't have to recruit anybody because people were coming in on their own." King said she had friends from San Antonio and other people who "wanted to get in." When a person paid in someone's name, the "someone" would move from one level to the next. Garcia recalled King stated that the money could be used for college or bills but "not to deposit it at the bank because of taxes." At the October 19, 2000 gathering, Garcia saw her friend Bartolita Torres as "kind of nervous. She was taking her money." Garcia saw Torres give King $5,000 in cash.

On a later date, Garcia gave $2,500 she obtained from her credit card.[9] Garcia contacted King after concerns arose about the program. King assured her that "it wasn't the same thing, that those were pyramids and this was not a pyramid and it was legal . . . that the original dinner party had attorneys . . . that they were speaking to." At two subsequent meetings, King and two other women said that the "tables were not moving . . . It was at

a standstill." At the meetings, King stated that she had to take a leave of absence from work to concentrate on the program. King encouraged the attendees to "start bringing people in so that the tables could move and the plates could move." Garcia testified that there were no products sold in order to recoup the $2,500 she gave. Garcia never received any money in return for her gift.

Ludivina Vega testified that in October 2000, she attended a meeting at a residence involving a "club of women helping women." At the meeting, King told the attendees that the club was to help people with their debt or college funds for their children. King stated that the program was "legal . . . she had her attorneys in the case of emergency." King further stated that the money need not be deposited in the bank "so we didn't have to pay the IRS, for us not to be worried that it could be some kind of fraud." Vega's testimony regarding the fees for the plates and the "gifting" mirrored Garcia's testimony.[10] At one party, Vega saw Torres give $2,500. At another, Torres gave $5,000. After Vega gave $2,500 and received nothing, she called King who told her she would give her the money in December. At a subsequent conversation, King told her she would give Vega the money in January. Vega never received any money.

Enedelia Tijerina testified that, sometime in October 2000, she became involved with WHW after King spoke with employees at her work. Tijerina understood that "you gave some money and a few weeks

---

**8.** Garcia described the three levels of King's diagram. The bottom level, known as the soup and salad level, had four plates. The second level, known as the entree, had two plates. The top level, the dessert, had one plate. Each plate was $5,000 and could be split in half.

**9.** The jury acquitted King on Count 3 alleging a pyramid promotional scheme involving Garcia's money.

**10.** Vega testified that King said she "had a waiting list and she would bring in people. She was bringing people in from San Antonio."

later you birthday. You got more money than what you put in." Tijerina added that "$5,000 was a plate and you birthdayed and you got $20,000." [11] King followed up with Tijerina by telephone to see if she was interested in participating. Because Tijerina did not understand how the program worked, the two met later and King explained the program to show her how it worked. Tijerina joined the club and gave money on October 19, 2000, at a party. King was in charge of the party, gave a presentation, and was the "motivator." King used diagrams to show the "tables" and how the program worked. On that date, Tijerina saw Torres give King $5,000. Tijerina recalled attending at least four additional parties, one with about seventy women in attendance. King was the "spokesperson" each time and made the same presentation each time about "women helping women." At some point, King met with Tijerina to assist her to dissuade Torres from pursuing charges or "whatever she was going to do to get her money back." King told her that, if Torres "proceeded with this and if some-thing happened that everybody at" Tijerina's work would be "involved ... if something was going to happen to [King], we were all involved."

The complainant, Bartolita Torres, testified that King approached her co-workers and her at work on October 16, 2000, and explained how the "dinner party" worked. King explained the program and returned another time to notify them about a party on October 19, 2000. Torres attended and gave King $5,000, money from her children's college education fund. King told her the money would be given to King's mother who was out of town. After attending additional parties, four total, and learning that King, King's mother, and a pet belonging to one of King's friends "birthdayed," Torres gave an additional $2,500 at a November party, hoping to "birthday." [12] At one party, King told the attendees that "things had stopped" and they needed to recruit people. King communicated with Torres by e-mail because "we couldn't be calling them ... that's what they told us." Once "things stopped," Torres called King because she

---

11. Tijerina was not interested in "bringing people in." She testified that King spoke of "people lined up that were ready to come in," including people from San Antonio.

12. When Torres gave $2,500 on November 2, 2000, she signed a form, admitted in evidence. Torres had previously signed a similar form when she gave $5,000. The form states:

Original Dinner Partyr
Gifting Activity
INFORMED CONSENT AND ACKNOWLEDGMENT
By signing below, I have decided to willingly participate in the gifting activities of the Original Dinner Partyr (ODP). I have been fully informed and as a consenting adult, I acknowledge that no guarantee or assurances as to the results that may be obtained from my participation have been given to me. I have no expectation of gifts given by me to be returned to me in any amount for any reason.

I acknowledge that I have received and read, or had read to me, the Original Dinner Partyr Guidelines (*Revised 10.23.00*), and I accept and agree to comply with the Original Dinner Partyr Guidelines. In the event I should fail to abide by all of the Original Partyr Guidelines, I understand that I can no longer consider myself a part of the Original Dinner Partyr and I waive any and all liability on the part of the Original Dinner Partyr and/or its participants.

I further state that I have attended at least two (2) Original Dinner Partyr-sanctioned informational meetings.

Dated WITNESSED:

_____ _____
Invitee Signature Invitor Signature

Printed Name Printed Name Table #

never received any money and demanded her money back. The following February, King agreed to return her money, then later recanted. On November 12, 2001, Torres spoke with King again. King had initiated the telephone call. King told her she would not be returning the money on advice of her lawyers. Torres testified that the women did not have to buy products. Torres testified that the persons she knew "birthdayed" were King, King's dog, King's mother, and King's male friend.

### b. The Defense's Witnesses

Raul Balli testified that he knew King for many years. He told King he had heard about a "women helping women club" from someone else. King told him she knew about the club and was involved. Balli opted to participate by giving $5,000 in his dog's name because the club was limited to women. Ultimately, Balli received $20,000, representing $5,000 he gave and $15,000 "gifted" to him. Balli testified he participated because he "wanted to make a little extra money ... although it was risky, I still went ahead and tried to make some money.... It was certainly a gamble." Balli testified:

> Q: Okay. What was your understanding if you gave $5,000 of what you were expecting in return?
>
> A: It was a gamble. I was very much aware of that and that's why I signed that it was supposed to be a gift, but it was a good chance that I could get money in return. And the lady friend from Brownsville emphasized that everybody was making good on it.
>
> Q: But how much money were you expecting to get in return? How much money were you told you were supposed to get?
>
> A: I believe the amount that I got.
>
> Q: Which would be the $20,000?

> A: They were making $35,000 and they were making a good-put in $5,000 and you were making $15,000 profit or something like that.
>
> Q: So the total you got was $20,000?
>
> A: That is correct.... So it was gambling. I wasn't totally sure that I was going to get the money back.
>
> Q: What was your understanding if this was a gift? Who were you giving it to?
>
> A: To that woman's club ... to the women participating in the club.
>
> Q: Did you know who that money was going to directly?
>
> A: No, no.
>
> Q: Did you ever ask?
>
> A: Not really.

Balli admitted that he was an exception because he participated in a club exclusively for women and he did not attend any meetings or parties.

King testified on her own behalf. She denied intent, culpability, and criminality of the program. She denied she invented, prepared, contrived or established the gifting club. She learned that the gifting club originated in Canada. From Austin, King reached the five thousand participants in the county. King attended the first meeting of WHW in August of 2000. There, she saw prominent people in the community. She learned the gifting club was a way for women to support each other, secure scholarship money, or help other women who were in trouble. Her role at subsequent meetings she attended was as a translator and not a speaker. King testified as follows as to how the plan worked:

> Q: And in order for the club to work, four people had to come in and bring in $5,000 and there was a person who birthdayed out at $20,000; isn't that correct?

A: That is correct.

Q: And if those individuals wanted to get $20,000, then another four people would have to bring in $5,000 so they could get $15,000 returned on their $5,000 investment; isn't that correct?

A: That is right.

Q: Okay. And so if they wanted to birthday out, more money needed to come in so they could get their money; isn't that correct?

A: That is correct.

Q: Okay. And then people just moved up from level to level to level?

A: And they got out.

Q: But they moved up from-you went in on the salad level, correct?

A: Right. . . . A lot of people came in like Mr. Balli and other people and they got their 20 and they left.

Q: Right. And then they would move . . . up to the entree level, correct?

A: Right.

Q: And then they would move up to the dessert level before they moved out, correct?

A: The entree level was just nothing. It was just-it was nothing. The four people at the bottom gave to the one person at the top.

Q: Right. But there was one level in between before you received your $20,000 or your $10,000.

A: Yeah, you didn't go from . . . the bottom to an entree to the top. It was directly from the bottom to the top.

Q: Right. And then once that person, as you say, left, then the entrees become desserts?

A: Right.

Q: And then you would have new tables because you would have to split, right?

A: But each table was a separate entity. . . .

Q: In other words, so whoever deserted could use the money for whatever purpose they wanted?

A: Exactly. . . .

King admitted: (1) she distributed documents for "gifting" participants to sign; (2) she distributed and explained diagrams of the "dinner tables" showing the three levels of gifting; (3) she explained the club to women who were "going to those meetings and they weren't understanding what they were doing"; and (4) her mother, Balli, and she "birthdayed" out when each received $20,000. Finally, King admitted that she forwarded one and generated another e-mail regarding the club's activities. Both e-mails were admitted in evidence. The e-mail she wrote states:

From: Gayle King

To: [Addressees]

Sent: Saturday, September 23, 2000 8:34 AM

Subject: FOR YOUR INFORMATION

Hi Chicas,

Deldi and I are going to speak at the meeting on Sunday at 217 Quail Court in the North Garden Estates. It is at 4:00 PM. I will speak in Spanish also. I would like for you to invite friends to come and listen. It is so important that they come to a meeting before they decide to participate in the Original Dinner Party. The next step would be to invite them to a birthday. I will get times and dates from Deldi. Deldi is also going [to] explain a strategy for 4 tables. As soon as Melinda birthdays we will implement it. SO CHICAS, LETS [sic] WORK HARD TO BIRTHDAY MELINDA!!! Today I am going to go through all my addresses and people I know, even people I may not know well that could use the support of our group,

even if they are not ready yet, it would still be a wonderful experience to grow with us and feel the energy that we give each other. That is the spiritual birthday gift we empower each other with. I will call each of you as well. I will also talk to Deldi about speaking at the meeting on Thursday also.

I am sending you each others phone numbers, the e-mails for ODP information etc.

[Names and telephone numbers of seven women]

The following are e-mail addresses to get information:

[E-mail addresses for club updates, meeting times and places, speakers for meetings, and volunteering to be trained as a monitor or speaker]

King forwarded another e-mail on October 25, 2000. That e-mail reflects the time and place for various meetings throughout October and November in various locations, identifying hostesses and speakers for each site.

King's best friend, Sandra Hamlin, testified that she attended one WHW meeting with King. King told Hamlin that King had "to talk to these women, that they are needing this explanation as to what this is, and we are going to go on." When asked why she did not join the club, Hamlin testified, "Because I didn't believe in it. I made a choice not to get involved with that."

### 3. Pyramid Scheme Analysis

The hypothetically correct jury charge against which we measure legal sufficiency in Count 1 of the indictment would ask the jury if King: (1) on or about October 19,

2000; [13] (2) intentionally and knowingly; (3) contrived, prepared, established, operated, promoted, advertised and sold; (4) a pyramid promotional scheme; (5) involving Bartolita Torres; (6) who paid $5,000 consideration for an opportunity for compensation from other than the sale of a product. For Count 2, the hypothetically correct jury charge would contain the same elements as alleged to have occurred on November 2, 2001, and involving $2,500 consideration.

In the September 23, 2000 e-mail, King (1) invited women to attend a Sunday "Original Dinner Party" where "strategy for 4 tables" would be addressed, (2) stated she would be a speaker, (3) encouraged the women to invite friends to attend the dinner "before they decide[d] to participate," (4) informed women that the next step would be a "birthday," (5) solicited women to work hard to "birthday" a participant, and (6) volunteered to speak at a similar Thursday meeting. On October 25, 2000, King forwarded an e-mail to women notifying of the time and place of club meetings.

Viewed in the light most favorable to the verdict, additional evidence demonstrates that the State's witnesses, including the complainant, joined a woman's club with a "gifting" plan in place. The plan involved a gift of $2,500 for a return of $10,000 and $5,000 for a return of $20,000, provided a sufficient number of women joined the club. Each witness paid the requisite gift of either $2,500 for half a plate or $5,000 for a full plate to enter the "soup and salad" level of a table. Torres "gifted" $5,000 to King. Later she "gifted" $2,500

---

**13.** The prosecution is limited to using proof of offenses occurring prior to the date of the indictment's presentment and within the statute of limitations period; the prosecution is not otherwise bound by the "on or about" date alleged in the information. *See* TEX.CODE CRIM. PROC. ANN. art. 21.02(6) (Vernon 1989); *Sledge v. State,* 953 S.W.2d 253, 256 (Tex. Crim.App.1997) (en banc).

to King's mother through King. According to each State's witness, she was invited and/or encouraged to join the club by King, either through King's personal contact or her motivational talks at the meetings attended. Club members were requested to invite and secure other women to participate in the plan. Participants "birthdayed" at the "dessert level" after all the "plates" on the "dinner tables" were paid. King, her mother, her friend Balli, and Balli's pet were "birthdayed." The State's witnesses were not. Return on the money gifted was not from the sale of products. By her e-mail and when the plan reached a "stand still," King encouraged participants to invite friends. Upon non-receipt of a return on the money she gifted, Torres requested her money back from King, but the money was never returned. Documents in evidence demonstrate the three levels of plates on dinner tables. King admitted distributing the documents and explaining them and the plan at WHW meetings. King's e-mail, dated September 23, 2000, confirms a "strategy for 4 tables" would be discussed at the scheduled dinner party.

We conclude that the evidence demonstrates that the "gift" club was a plan by which a person gave consideration for the opportunity to receive compensation that was derived primarily from a person's introduction of other persons to participate in the plan, rather than from the sale of a product by a person introduced into the plan. The evidence demonstrates that King induced one or more other persons to participate in a pyramid promotional scheme or assisted another person in inducing or attempting to induce one or more other persons to participate in a pyramid promotional scheme. TEX. BUS. & COM.CODE ANN. § 17.461(a)(6). Thus, we conclude that a rational trier of fact could have found beyond a reasonable doubt the essential elements of a pyramid promotional scheme. TEX. BUS. & COM.CODE ANN. § 17.461(a)(5)(A)-(B). We conclude the evidence is legally sufficient.

### C. Theft by Deception

■ By her fourth issue, King also asserts that the evidence is legally insufficient to prove she committed theft by deception as alleged in Count 5 of the indictment.[14] The State counters that the evidence is sufficient.

### 1. The Law

Count 5 of the indictment charged King with theft of property by deception. The hypothetically correct jury charge against which we measure the sufficiency of the evidence would ask the jury if King, (1) on or about October 19, 2000, (2) unlawfully, (3) appropriated property, (4) with the intent to deprive the owner of the property. TEX. PEN.CODE ANN. § 31.03 (Vernon Supp. 2004–05); Thomason v. State, 892 S.W.2d 8, 10 (Tex.Crim.App.1994) (en banc). "Appropriate" means to bring about a transfer of title or other non-possessory interest in property or to acquire or otherwise exercise control over property. See TEX. PEN. CODE ANN. § 31.01(4) (Vernon Supp.2004– 05). The statute defines three ways in which an appropriation is unlawful, including "without the owner's effective consent." TEX. PEN.CODE ANN. § 31.03(b)(1), § 31.01(4); Stockman v. State, 826 S.W.2d 627, 636 (Tex.App.-Dallas 1992, pet. ref'd).

■ Thus, the crucial element of theft is the deprivation of property from the

14. As to Count 5, the indictment alleged that, on or about October 19, 2000, King unlawfully appropriated, by acquiring and otherwise exercising control over, property, namely, $5,000 in United States currency from Bartolita Torres, the owner, without the effective consent of the owner by deception and with intent to deprive the owner of the property.

rightful owner, without the owner's consent, regardless of whether the defendant at that moment has taken possession of the property. *Stewart v. State*, 44 S.W.3d 582, 589 (Tex.Crim.App.2001) (en banc). Consent is not effective if induced by deception or coercion. TEX. PEN.CODE ANN. § 31.01(3)(A) (Vernon Supp.2004–05). Penal Code section 31.01(1) contains five definitions of "deception." *Id.* § 31.01(1) (Vernon Supp.2004–05). Deception means, among other things, promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed. *Id.* § 31.01(1)(E) (Vernon Supp.2004–05). "Deprive" means to withhold property from the owner permanently. TEX. PEN.CODE ANN. § 31.01(2)(C) (Vernon Supp.2004–05). The intent to deprive is determined from the words and acts of the accused. *Griffin v. State*, 614 S.W.2d 155, 159 (Tex.Crim.App. 1981); *Roberson v. State*, 821 S.W.2d 446, 448 (Tex.App.-Corpus Christi 1991, pet. ref'd).

### 2. The Record

King focuses her argument on a document admitted in evidence. The document signed by the complainant Torres on October 19, 2000, states:

> This money is a gift ($5,000) and is freely given to Checa K without consideration. All taxes have been paid on this money and I have not been coerced in any way or by anyone to give this money.

> This money is strictly a gift and I expect nothing in return from the person I am gifting.

King argues that the document demonstrates that the $5,000 was Torres' gift to King's mother without any expectation of return, and thus the evidence negates the essential elements of the offense of theft. King admitted that she returned money to another participant who did not "birthday." She further admitted that she did not really know the women involved in the plan. When the prosecutor asked why Torres would give $5,000 to someone she really did not know without expecting something in return, King answered, "We were all in the same thing together. We all came in for the same reason and the same way." King explained that the plan was part of giving back to the community, including assisting an orphanage in Mexico and helping women. King's witnesses, Hamlin and Balli, unequivocally testified that participation in the plan was a gamble, a risk. Hamlin did not assume the risk. Balli did and received a return. Balli further testified that he signed a document, indicating that his $5,000 was a gift. However, he did not know who he was helping. Balli did not attend meetings. The record does not establish that he was asked to invite friends to participate in the plan, as King encouraged in her e-mail.

Viewed in the light most favorable to the verdict under the *Jackson* standard, the evidence shows that King touted the success of the plan to women both by personal contact and by speaking at WHW gatherings, whether dinner parties or meetings. The State's witnesses uniformly testified that King represented that they need not "recruit" participants because people as far away as San Antonio were lined up to participate in the plan. King's e-mail confirms she would be contacting people "I know, even people I may not know well." When the plan reached a "standstill," however, and women had gifted, King encouraged the participants to bring others, stat-

ing at one point that she had taken a leave of absence from work to concentrate on the plan.

The State's witnesses testified they saw Torres give King $5,000 in cash on October 19, 2000. King's mother was not present. King admitted she provided Torres the document to sign. Torres testified that she did not read the document before signing it. King admitted that she explained the plan to participants because they did not know what they were doing. King's mother "birthdayed," receiving $20,000. Torres did not. Torres testified that she expected that her $5,000 would multiply to $20,000. When that did not occur, Torres requested that King return the money. King refused. King testified that, although the return was not effected, she agreed to return the money to Torres because King "felt responsible for her mother."

### 3. Theft By Deception Analysis

Torres attended a party on October 19, 2000, and delivered $5,000 in cash to King. ·Torres unequivocally testified that she expected a return of her $5,000, multiplied, based on King's representations. King, her mother, and her friend Balli "birthdayed," receiving $20,000 in return for their $5,000 "gift." King "birthdayed" at the October 19, 2000 meeting. The gifts of King and persons related to or acquainted with her resulted in a return of their gifts. King made an exception to the all women rule for Balli by using his female pet's name as the participant. Torres and the State's witnesses complied with the terms of their gifts, including recruitment, expecting a return that did not materialize.

The legal sufficiency standard of review is meant to give "full play to the [jury's] responsibility fairly" to "draw reasonable inferences from basic facts to ultimate facts." Sanders, 119 S.W.3d at 820; Grif-

fin, 614 S.W.2d at 159. We consider all the evidence that sustains the conviction, whether properly or improperly admitted. Conner, 67 S.W.3d at 197 (citing Garcia, 919 S.W.2d at 378); see Moff v. State, 131 S.W.3d 485, 489–90 (Tex.Crim.App.2004). Similarly, we consider all the evidence that sustains the conviction, whether submitted by the prosecution or the defense, in determining the legal sufficiency of the evidence. King, 29 S.W.3d at 562; Cook, 858 S.W.2d at 470. In this review, we are not to reevaluate the weight and credibility of the evidence, but rather, we act only to ensure that the jury reached a rational decision. Muniz, 851 S.W.2d at 246. The standard of review is the same in both direct and circumstantial evidence cases. Kutzner v. State, 994 S.W.2d 180, 184 (Tex. Crim.App.1999). We are mindful that every fact need not point directly and independently to the accused's guilt. Vanderbilt v. State, 629 S.W.2d 709, 716 (Tex. Crim.App.1981). A conclusion of guilt can rest on the combined and cumulative force of all the incriminating circumstances. Id.; Beardsley v. State, 738 S.W.2d 681, 685 (Tex.Crim.App.1987) (en banc).

█ In this case, the ultimate facts in question were (1) appropriation of the currency and (2) the specific intent to deprive the owner of it by deception. A jury may infer intent from any facts which tend to prove its existence, including the method of committing the crime. See Manrique v. State, 994 S.W.2d 640, 649 (Tex.Crim.App. 1999) (en banc). The evidence demonstrates that King knew that the plate plan could not, would not, and did not work without regular recruitment of women with $2,500 to $5,000 to gift. A return on Torres' $5,000 was contingent upon continued recruitment of women with $2,500 to $5,000 to gift. The jury could have reasonably inferred that King's representation that people were lined up for the

program coupled with the promise of a return likely affected the judgment of Torres. Indeed, when she did not receive a return on her $5,000, while aware that King, King's mother and friend "birthdayed," Torres gifted an additional $2,500 as an added effort to "birthday."

On this record, we cannot say that a jury would have unfairly or irrationally inferred that King appropriated the property with the specific intent to deprive Torres, the owner, of it by deception. *See Sanders,* 119 S.W.3d at 821; *see also Griffin,* 614 S.W.2d at 159. We assume that the jury resolved conflicts in testimony, weighed the evidence, and drew reasonable inferences in the manner that supports the verdict. *Griffin,* 614 S.W.2d at 159. Thus, viewing the evidence in the light most favorable to the verdict and measuring it against the essential elements of theft by deception as defined in a hypothetically correct jury charge, we conclude that a rational jury could have inferred the ultimate facts that King appropriated the currency, by acquiring or otherwise exercising control over it, with the intent to deprive Torres, the owner, of the currency by deception. *See Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *Malik,* 953 S.W.2d at 240. We overrule King's fourth issue.

## IV. CHARGE ERROR–MISTAKE OF FACT DEFENSE

By her first issue and a sub-issue in her third issue, King asserts that the trial court reversibly erred by refusing to include a proposed mistake of fact defense instruction in the jury charge. By her sixth issue, King argues that omission of the requisite knowledge instruction was egregious error. King argues that the instruction would have told the jury to acquit if it found King, through mistake, formed a reasonable belief about a factual matter, if her mistaken belief negated the

kind of culpability required for commission of the offense. The State counters that King's claim that she was unaware the plan was a pyramid scheme is not a mistake of fact defense.

### A. Standard of Review

Our first duty in analyzing a jury-charge issue is to determine whether error exists. *Middleton v. State,* 125 S.W.3d 450, 453 (Tex.Crim.App.2003) (en banc) (citing *Hutch v. State,* 922 S.W.2d 166, 170–71 (Tex.Crim.App.1996) (en banc)). Then, if we find error, we analyze that error for harm. *Middleton,* 125 S.W.3d at 453. Preservation of charge error does not become an issue until we assess harm. *Id.* The degree of harm necessary for reversal depends on whether the appellant preserved the error. *Id.* (quoting *Hutch,* 922 S.W.2d at 171); *see Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (op. on reh'g) (en banc). Thus, we review alleged charge error by answering two questions: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal. *See Posey v. State,* 966 S.W.2d 57, 60 n. 5 (Tex.Crim. App.1998) (en banc); *see Ngo v. State,* 175 S.W.3d 738, 744, 2005 WL 600353, at *6, 2005 Tex.Crim.App. LEXIS 457, at *8 (Tex.Crim.App. March 16, 2005) (en banc). Under the *Almanza* standard, the record must show that a defendant has suffered actual, rather than merely theoretical, harm from jury instruction error. *Posey,* 966 S.W.2d at 60 n. 5. Errors that result in egregious harm are those that affect "the very basis of the case," "deprive the defendant of a valuable right," or "vitally affect a defensive theory." *Id.; Ngo,* at 750, 2005 WL 600353, at *6, 2005 Tex.Crim. App. LEXIS 457, at *8. Under *Almanza,* to determine whether the error was so egregious that a defendant was denied a fair and impartial trial, a reviewing court

should examine (1) the entire jury charge, (2) the state of the evidence, (3) the arguments of counsel, and (4) any other relevant information in the record. *Id.*

### B. The Law

 A defendant is entitled to the submission of every defensive issue raised by the evidence, even if the defense may be inconsistent with other defenses. *Bowen v. State*, 162 S.W.3d 226, 229 (Tex.Crim. App.2005). Furthermore, an accused has the right to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the defense. *Hamel v. State*, 916 S.W.2d 491, 493 (Tex.Crim.App.1996).

### C. The Record

King testified about the origins of the club in Canada and how it reached the county through Austin. She surmised that the club was legal because she observed prominent people at the meetings. She testified that the local district attorney announced publicly that he would prosecute participants in the club. When participants contacted her after learning of the district attorney's announcement, King told them that the club was not a pyramid. Regarding her denial that the club was a pyramid scheme, the following colloquy occurred during cross-examination:

Q: Mrs. King, just so I understand, Mrs. King, you understood that this scheme was not a pyramid, is that correct?

A: It was never presented to me in that way.

Q: Do you have an understanding of what a pyramid scheme is?

A: My general understanding was that the person at the top is always receiving a benefit from all the people that keep coming in. There is always one person at the top.

Q: And that is a key fact for you, that there is always one person at the top?

A: There is always one person at the top. Like, for example, the person that started this in Canada would still be receiving all the benefits of all the 5,000 people that came in McAllen, that sort of thing.

King further testified that, of all the persons involved including the State's witnesses, she was singled out for prosecution.

The defense called an expert to testify as to whether the WHW plan was a pyramid scheme. The expert testified that in a pyramid scheme, "the bottom line is that people go in there for a particular reason and they want to make money and, of course, basically it's—they want to end up [at the top]." He further testified, "And, of course, the bottom line is that people can move up, you know, and, of course, everybody wants the American dream. They want to make a lot of money and they can eventually—that is the pyramid scheme." The defense expert enumerated the variables indicating that the WHW plan was not a pyramid: (1) the person would make $20,000 and "get out"; in the traditional pyramid scheme, that person would continue making money; (2) the participants' money was a gift—there was no commission, no payment; (3) there was no trade or commerce; usually in a pyramid scheme there is a sale of a product, but here "it was a one-shot deal and that person could make $10,000 or $20,000." The expert emphasized that the gifting document proved the money was "a gift ... that was given with nothing in return." He also emphasized that the money was presented "wrapped" as a gift and was "not a payment." The expert's opinion was that, given all these considerations,

the original dinner party gifting and WHW was not a pyramid. He stated, "[f]rom my understanding, it may look like a pyramid but it is not a pyramid." In short, the expert's definition of a pyramid scheme required the selling of a product or service.[15]

The State's evidence demonstrated that King assured one participant that "this was not a pyramid and it was legal ... that the original dinner party had attorneys ... that they were speaking to." The gifting documents admitted in evidence required the participants to acknowledge "informed consent" and "waive any and all liability" for not meeting ODP guidelines.

The State argued that ignorance of the law was no defense. King represented there would be a return and, when a person presents a gift, "gifting documents" are not required by the gift recipient as King required. The defense argued that King was unaware the club was a pyramid or that it was illegal.

### D. Charge Error Analysis

The trial court charged the jury on the offense of promoting, organizing, or operating a pyramid promotional scheme. King asserts in her first issue on appeal that the trial court erroneously denied her a requested instruction on mistake of fact based on her testimony that she did not know the plan was illegal or was a pyramid scheme. The State responds that the trial court properly denied the instruction.

King preserved error. See Tex.R.App. P. 33.1. There are eight court charges, one for each of the indicted counts. The charges instruct the jury on the culpable mental state instruction under section 6.03 for each of the eight indicted offenses. Tex. Pen.Code Ann. § 6.03 (Vernon 2003). The pyramid-promotional-scheme charges contain King's requested instruction on complicity involving the State's witnesses, see Tex. Pen.Code Ann. § 7.01 (Vernon 2003), and the statutory definition for the offense. See Tex. Bus. & Com.Code Ann. § 17.461(a)(6). King argues that, by its terms, section 8.02 of the penal code involves a mistaken belief that negates culpability for all the charged offenses. See Tex. Pen.Code Ann. § 8.02 (Vernon 2003). The State counters that ignorance of the law is no defense under section 8.03(a) of the penal code, and the evidence does not raise a mistake of fact defense. See Tex. Pen.Code Ann. § 8.03(a) (Vernon 2003).

The burden lies with the appellant to persuade the reviewing court that the error was harmful. See Abdnor v. State, 871 S.W.2d 726, 732 (Tex.Crim.App. 1994) (en banc). If the appellant is unable to do so, the error will not result in reversal. Id. We conclude that King has not shown, nor do we find, error in the trial court's charges to the jury. King testified as to her understanding of a pyramid scheme. Her understanding is not inconsistent with the definition of a pyramid promotional scheme. See Tex. Bus. & Com. Code Ann. § 17.461(a)(6). King does not address how a mistaken belief that the club was not a pyramid scheme negates culpability for the offense of theft by deception. She argues that she suffered actual harm from the faulty jury instruction and that she was, in fact, deprived of an acquittal on all charges. However, the jury convicted King on three out of eight counts, demonstrating careful deliberation

---

**15.** Regarding the expert's definition of a pyramid scheme, the trial court stated, "Legally or illegally, I think the jury is going to decide that down the road and I will give you the definitions, if you will. I will give you the law, all the law you will ever need to decide the issues before you."

and consideration of the culpable mental state definition in the charge as applied to the evidence before it. That evidence includes King's and her expert's definitions of a pyramid scheme. Based on this state of the record, we also conclude that King was neither harmed nor "egregiously harmed" by any error in the charge because (1) the jury could have given effect to her defense and acquitted her under the instructions given, and (2), as we have already concluded, the evidence is sufficient to support the offenses.

We overrule King's first issue, the sub-issue asserted in her third issue, and her sixth issue.

## V. CONSTITUTIONALITY CLAIMS

By her third issue, King argues that the pyramid promotional scheme statute is unconstitutional as worded and applied. *See* TEX. BUS. & COM.CODE ANN. § 17.461. She asserts that the statute: is overbroad and violates her right to free speech under the First and Fourteenth Amendments to the U.S. Constitution. *See* U.S. CONST. amend. I, XIV. The State responds that the issue is inadequately briefed and without merit.

### A. Standard of Review

When reviewing the constitutionality of a statute, we presume that the statute is valid and that the legislature acted reasonably, not arbitrarily, in enacting the statute. *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex.Crim.App.2002). The burden rests on the individual who challenges the statute to prove its unconstitutionality. *Id.* If a reasonable construction of the statute will render it constitutional, the court must uphold the statute. *Ely v. State*, 582 S.W.2d 416, 419 (Tex.Crim.App. 1979) (en banc).

### B. Constitutionality Analysis

King argues that the statute unconstitutionally (1) criminalizes conduct without proof of time, place, or knowledge that conduct is criminally proscribed and (2) contains vague words that are not statutorily defined.[16]

### 1. As Applied

In order to review an attack on the constitutionality of a statute "as applied," the one challenging the statute must have raised the issue in the trial court. TEX.R.APP. P. 33.1(a)(1); *Curry v. State*, 910 S.W.2d 490, 496 (Tex.Crim.App. 1995) (en banc); *Bader v. State*, 15 S.W.3d 599, 603 (Tex.App.-Austin 2000, pet. ref'd). Since King did not raise an as-applied objection at trial, she has failed to preserve this objection for appellate consideration. Thus, we need not consider whether the statute was unconstitutionally applied to her.

### 2. Overbreadth

In analyzing a facial challenge to the overbreadth and vagueness of a law, the Supreme Court has stated that the first task is to determine whether the statute reaches a substantial amount of constitutionally protected conduct. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). Criminal statutes must be scrutinized with particular care. *City of Houston v. Hill*, 482 U.S. 451, 459, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). A statute is overbroad if it sweeps within its coverage speech or conduct that is protected by the First Amendment.

16. The complained of words are "organize, establish, participate, contrive, prepare, advertise, sell, induce, attempting to induce, assist another in inducing, and assisting another in attempting to induce."

*Clark v. State,* 665 S.W.2d 476, 482 (Tex. Crim.App.1984) (en banc).

Essentially, King asserts that her sole conduct was to interpret presentations of speakers who explained the pyramid scheme during the WHW gatherings. She argues that, because her conviction was based on that conduct, the statute impermissibly and unconstitutionally proscribed her right to free speech. However, King testified that she received monetary gifts for purchases of plates at her "dinner table" in the club, and thus, she promoted the scheme by means other than her speech. The statute defines "promoting a pyramid promotional scheme" to mean (1) inducing or attempting to induce one or more other persons to participate in a pyramid promotional scheme, or (2) assisting another person in inducing or attempting to induce one or more other persons to participate in a pyramid promotional scheme, including by providing references. TEX. BUS. & COM.CODE ANN. § 17.461(a)(5)(A)-(B). We have concluded the evidence was sufficient to sustain her conviction under the statute for other than her constitutionally protected speech, either oral or written. Even so, we find no authority for the proposition that translating a presentation that explains a prohibited criminal scheme is protected by the First Amendment. The statute does not proscribe mere communication. King's overbreadth challenge fails. *See Clark,* 665 S.W.2d at 482.

### 3. Vagueness

 We turn to King's facial vagueness challenge. Because the statute implicates no constitutionally protected conduct, we uphold the challenge only if the enactment is impermissibly vague in all of its applications. *Village of Hoffman Estates,* 455 U.S. at 494, 102 S.Ct. 1186.[17] A statute is void for vagueness and lacks the first essential element of due process when it either forbids or requires the doing of an act in terms so vague that people of common intelligence must guess as to its meaning and differ as to its application. *Id.* at 498, 102 S.Ct. 1186. A statute that is not definite enough for a person to know, understand, and apply its terms and provisions is void and unenforceable. *Id.* A statute is unconstitutionally void for vagueness if it specifies no standard of conduct or defines no core of prohibited activity. *Briggs v. State,* 740 S.W.2d 803, 806 (Tex.Crim.App.1987) (en banc). Thus, a statute is void for vagueness when (1) it fails to give a person of ordinary intelligence fair notice of the conduct prohibited, or (2) is so indefinite that it encourages arbitrary and discriminatory enforcement. *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Clark,* 665 S.W.2d at 482.

 King focuses on evidence that she did not know that the WHW club's gifting activity was illegal. She argues that the complained-of words are capable of different meanings, and so, the statute contains no standard for determining what a suspect must do in order to satisfy, among other elements, the mens rea requirement of the prohibited conduct. Thus, she argues, the statute is void for vagueness because it does not provide fair notice of the prohibited conduct. When a statutory term is not directly defined, the term

---

17. When a vagueness challenge involves First Amendment concerns, the statute may be held facially invalid even though it may not be unconstitutional as applied to the appellant's conduct. *Long v. State,* 931 S.W.2d 285, 288 (Tex.Crim.App.1996). There is some authority that in the limited context of a facial challenge, an appellate court must address the threshold as-applied challenge even if the issue was not raised below. *See Sullivan v. State,* 986 S.W.2d 708, 713–14 (Tex.App.-Dallas 1999, no pet.).

should be read in context and construed according to the rules of grammar and common usage. *See Pettijohn v. State,* 782 S.W.2d 866, 868 (Tex.Crim.App.1989) (en banc).

The statute defines the conduct that is proscribed. *See* TEX. BUS. & COM.CODE ANN. § 17.461(a)(5)(A)-(B). King's understanding of what an illegal pyramid scheme involved is not inconsistent with the statute's terms. The complained-of words are accorded their ordinary usage. Thus, read in the statutory context and construed accordingly, they provide due notice of the proscribed conduct. King's vagueness challenge fails.

We overrule King's third issue.

## VI. DOUBLE JEOPARDY

By her seventh issue, King asserts that the State was required to make an election to convict and punish on Counts 1 and 2 (pyramid promotional scheme) or Count 5 (theft by deception) because the convictions and sentences punish the same conduct and, thus, violate the double jeopardy clause. The State counters that, among other things, the case involves three convictions derived from a single trial and clearly involves the multiple punishment aspect of jeopardy protection.

### A. The Law

The Fifth Amendment provides that "no person shall ... be subject for the same offence to be twice put in jeopardy of life or limb...." U.S. CONST. amend. V.; *see Lopez v. State,* 108 S.W.3d 293, 295 (Tex.Crim.App.2003). The United States Supreme Court stated that the Fifth Amendment guarantee against double jeopardy consists of three separate constitutional protections. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), overruled on other grounds, *Alabama v. Smith,* 490 U.S. 794–

795, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989); *Lopez,* 108 S.W.3d at 295. First, it protects against a second prosecution for the same offense after acquittal. *Lopez,* 108 S.W.3d at 295. Second, it protects against a second prosecution for the same offense after conviction. *Id.* Last, it protects against multiple punishments for the same offense. *Id.* In Texas, "No person for the same offense shall be twice put in jeopardy of life or liberty; nor shall a person be again put upon trial for the same offense, after a verdict of not guilty in a court of competent jurisdiction." TEX. CODE CRIM. PROC. ANN. art. 1.10 (Vernon 2005).

### B. The Record

The indictment alleged three statutory offenses occurring on two different dates. When the State rested its case in chief, King sought a directed verdict on all eight counts alleged. At that time, King argued that the State must elect to proceed on either a pyramid promotional scheme or the theft by deception offense, because they constituted the same offense. After the jury returned its guilty verdict on Counts 1, 2, and 5, King argued that the double jeopardy protections required punishment on either Counts 1 (pyramid promotional scheme) or 5 (theft by deception), not both, on grounds that she would be punished twice for the same offense involving Torres' $5,000 gift. The defense requested punishment on either Count 1 or 5, not both. The trial court denied the motion. The trial court assessed (1) concurrent punishment at two years in a State Jail facility, probated for five years, for Counts 1, 2, and 5; (2) a $500 fine on Count 1; and (3) $5,000 restitution for Count 1 and $2,500 restitution for Count 2.

### C. Double Jeopardy Analysis

King argues that she was impermissibly convicted and sentenced on Counts 1 and 5

for the same conduct. The sole double jeopardy protection King has preserved and invoked by her seventh issue is double jeopardy's bar against multiple punishments for the same offense.[18] *Lopez,* 108 S.W.3d at 295. Thus, the sole question before us is whether King was convicted and punished for the same offense on Counts 1 and 5.

### 1. Preservation of Error

■ Although an appellant has the burden to preserve, in some fashion, a double jeopardy objection at or before the time the charge is submitted to the jury, *Gonzalez v. State,* 8 S.W.3d 640, 642 (Tex. Crim.App.2000) (en banc), a double jeopardy claim may be raised for the first time on appeal, or even for the first time on collateral attack, when: (1) the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record; and (2) enforcement of usual rules of procedural default serves no legitimate state interests. *Id.* at 643. This Court concluded that under *Gonzalez,* "if a double jeopardy violation is clearly apparent, the defendant will prevail on appeal; if a double jeopardy violation is not apparent, the defendant's claim fails on the merits regardless of whether he objected at trial." *Jimenez v. State,* 67 S.W.3d 493, 509 (Tex. App.-Corpus Christi 2002, pet. ref'd). We, therefore, analyze whether a violation of the prohibition against double jeopardy is apparent from the record.

### 2. Blockburger Test

■ The double jeopardy bar applies to multiple punishments where the two offenses for which the defendant is punished or tried cannot survive the "same-elements" or *"Blockburger"* test. *United States v. Dixon,* 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (citing *e.g., Brown v. Ohio,* 432 U.S. 161, 168–69, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (multiple punishment); *Gavieres v. United States,* 220 U.S. 338, 342, 31 S.Ct. 421, 55 L.Ed. 489 (1911) (successive prosecutions)). When the same act or transaction violates two different penal statutes, the two offenses are the same for double jeopardy purposes if one of the offenses contains all the elements of the other; they are not the same if each offense has a unique element. *Blockburger,* 284 U.S. at 304, 52 S.Ct. 180.

### 3. Analysis

■ The protection provided by the double jeopardy clause of the United States Constitution has no application where separate and distinct offenses occur during the same transaction. *See Jones v. State,* 514 S.W.2d 255, 256 (Tex.Crim.App. 1974). King was convicted on three offenses: (1) promoting, organizing or operating a pyramid promotional scheme on October 19, 2000; (2) promoting, organizing or operating a pyramid promotional scheme on November 2, 2000; and (3) theft by deception on October 19, 2000.

We first analyze whether it is apparent from the record that King's multiple convictions constituted a double jeopardy violation. The record shows that, on October 19, 2000, King induced Torres and other women to participate in a pyramid promotional scheme or assisted another person in inducing Torres and other women to participate in a pyramid promotional scheme. Tex. Bus. & Com.Code Ann. § 17.461(a)(5)(A)-(B) (Vernon 2002). On

---

**18.** See our discussion on preservation of error that follows. King did not complain to the trial court that the offenses were greater or lesser included offenses of each other. Thus, these arguments are forfeited. *See* Tex. R.App. P. 33.1.

the same day, King unlawfully appropriated Torres' currency with the intent to deprive Torres of the property. TEX. PEN. CODE ANN. §§ 31.03, 31.01(1),(3). As the conviction for the pyramid promotional scheme offense was not based on the same conduct underlying the conviction for theft by deception, we find no apparent violation of the double jeopardy clause. *See Jimenez*, 67 S.W.3d at 509. Each conviction required proof of entirely separate elements and were separate acts. We, therefore, find that it is not apparent from the record that King's convictions for the pyramid promotional scheme and theft by deception violated the double jeopardy clause. *Id.* Our analysis shows that there are no double jeopardy issues apparent on the record. *See Id.* Therefore, we hold that King has failed to preserve her issue on appeal and has waived her double jeopardy challenges. *See id.*

We overrule King's seventh issue.

## VII. PRESERVATION OF ERROR

### A. Standard of Review

To preserve a complaint for appellate review, a party must present a timely request, objection, or motion to the trial court stating the specific grounds for the desired ruling if the specific grounds were not apparent from the context. TEX. R.APP. P. 33.1(a); *Blue v. State*, 41 S.W.3d 129, 131 (Tex.Crim.App.2000) (en banc); *see Keeter v. State*, 175 S.W.3d 756, 760, 2005 WL 766974, at *3 n.11, 2005 Tex. Crim.App. LEXIS 521, at *9 n. 11 (Tex. Crim.App. April 6, 2005) (citing *Lankston v. State*, 827 S.W.2d 907, 909 (Tex.Crim. App.1992) (en banc) ("All the party must do to avoid the forfeiture of a complaint on appeal is to let the trial court know what

he wants, why he thinks himself entitled to it, and to do so clearly enough for the trial court to understand him at a time when the trial court is in a proper position to do something about it.")). Generally, a party's failure to timely and specifically object at trial waives error. *See Blue*, 41 S.W.3d at 131. An accused may waive even constitutional rights. *Saldano v. State*, 70 S.W.3d 873, 891 (Tex.Crim.App.2002) (en banc); *Jenkins v. State*, 912 S.W.2d 793, 815 (Tex.Crim.App.1995) (op. on reh'g) (en banc). Nonetheless, rule 103(d) of the rules of evidence authorizes us in a criminal case to "take notice of fundamental errors affecting substantial rights although they were not brought to the attention of the court." TEX.R. EVID. 103(d). "Some rights are widely considered so fundamental to the proper functioning of our adjudicatory process as to enjoy special protection in the system." *Blue*, 41 S.W.3d at 131. "A principle [sic] characteristic of these rights is that they cannot be forfeited. That is to say, they are not extinguished by inaction alone." *Id.* Instead, an accused must expressly relinquish a fundamental right. *Id.*

### B. Restitution

By her second issue, King asserts that the trial court reversibly erred by ordering restitution of $5,000 in the judgment for Count 1 and $2,500 in Count 2.[19] She asserts that because the complainant Torres was *in pari delicto* with the gift recipients, Torres had unclean hands, King did not cause the gift, King was not the recipient, Torres suffered no economic loss, the evidence is insufficient to support the restitution amount, and Torres did not seek restitution. Thus, King argues, the trial court had no power to order restitu-

---

19. The judgment for Count 1 reflects $5,000 restitution ordered; the judgment for Count 2 reflects $2,500 restitution.

tion. The State counters that King did not preserve error.

During the sentencing phase, after the trial court pronounced punishment, the trial court addressed restitution. The defense's sole request was that the trial court separate the restitution amounts and enter them in the judgments for Counts 1 and 2. King did not present her complaints to the trial court before raising them in one issue on appeal. Thus, she has forfeited her complaint. *Id.; see also* TEX.R.APP. P. 33.1.

We overrule King's second issue.

### C. Selective Prosecution

By her fifth issue, King asserts that the conviction must be reversed on grounds that she was singled out for prosecution based on her race. Thus, she argues she was denied equal protection on grounds of invidious discrimination. King did not present her complaint to the trial court. Her complaint is forfeited. TEX. R.APP. P. 33.1.

We overrule King's fifth issue.

### D. Motion for New Trial

By her eighth issue, King asserts that the trial court abused its discretion by refusing and failing to schedule a hearing on her motion for new trial. The reporter's record shows that, on January 21, 2003, the trial court acknowledged receipt of the motion for new trial. In open court, the trial court pronounced it would not grant the motion for new trial. Defense counsel's sole objection was, "We object to your not ruling on our Motion for New Trial." The trial court denied the motion. The record does not demonstrate that King requested that a hearing be scheduled. She forfeited her complaint. *See* TEX.R.APP. P. 33.1.

We overrule King's eighth issue.

### VIII. CONCLUSION

Having overruled King's eight issues on appeal, we affirm the judgment of conviction and sentence on Counts 1, 2, and 5.