NUMBER 13-05-364-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


H.A. REED D/B/A REED

CONSTRUCTION, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 36th District Court of San Patricio County, Texas.


 


MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Yañez and Vela


Memorandum Opinion by Justice Yañez


 

 A jury convicted appellant, H. A. Reed d/b/a Reed Construction, of felony theft. (1) 
The trial court assessed punishment at ten years' imprisonment, suspended the sentence,
and placed appellant on community supervision for a period of ten years. (2) By three issues,
appellant contends (1) the evidence is legally and factually insufficient to support his
conviction and (2) he was denied effective assistance of counsel. We affirm.

Background


 In May 2003, appellant, a general contractor, entered into a "cost plus" construction
contract with the complainants, John and Beverly McGee, to build the McGees a "dream
home" on their property. (3) Over the next five months, appellant submitted five "draw
requests" for construction expenses, paid by Mr. McGee, in separate checks totaling
$123,700.00. Mr. McGee testified that he fired appellant in December when he learned
that appellant's $2,500.00 check to Manuel Gonzalez, the lead mason subcontractor, had
"bounced." Mr. McGee asked for an accounting. According to McGee, of the $123,700.00
paid to appellant, the materials and labor expended on the construction amounted to
$47,389.55, leaving $76,310.45 in unaccounted funds expended by the McGees. The
McGees contacted the district attorney's office. Following a jury trial, appellant was found
guilty of theft of more than $20,000.00, but less than $100,000.00. 

Standards of Review and Applicable Law 


 Evidence is legally insufficient if, when viewed in a light most favorable to the
verdict, a rational jury could not have found each element of the offense beyond a
reasonable doubt. (4) The jury is the exclusive judge of the credibility of witnesses and of the
weight to be given testimony, and it is also the exclusive province of the jury to reconcile
conflicts in the evidence. (5) Thus, when performing a legal-sufficiency review, we may not
re-evaluate the weight and credibility of the evidence and substitute our judgment for that
of the fact finder. (6) We must resolve any inconsistencies in the testimony in favor of the
verdict. (7) The legal sufficiency of the evidence is measured against the elements of the
offense as defined by a hypothetically correct jury charge for the case. (8)

 When conducting a factual-sufficiency review, we view all of the evidence in a
neutral light. (9) We may set the verdict aside if (1) the evidence is so weak that the verdict
is clearly wrong and manifestly unjust; or (2) the verdict is against the great weight and
preponderance of the evidence. (10) However, while we may disagree with the jury's
conclusions, we must exercise appropriate deference to avoid substituting our judgment
for that of the jury, particularly in matters of credibility. (11) Finally, we must discuss the
evidence that, according to appellant, most undermines the jury's verdict. (12)

 A person commits theft if the person unlawfully appropriates property with the intent
to deprive the owner of the property. (13) Appropriation is unlawful if it is without the owner's
effective consent. (14) An owner's consent is not effective if it is induced by deception. (15)
Among other meanings, "deception" includes:

promising performance that is likely to affect the judgment of another in the
transaction and that the actor does not intend to perform or knows will not be
performed, except that failure to perform the promise in issue without other
evidence of intent or knowledge is not sufficient proof that the actor did not
intend to perform or knew the promise would not be performed. (16)


 To constitute theft, the defendant must intend to deprive the owner of the property
at the time the property is taken. (17) The intent to deprive is determined from the words and
acts of the accused. (18) "In determining whether the evidence is legally sufficient to establish
whether appellant had criminal intent to commit theft, we examine the evidence in the
record in a light most favorable to the jury's verdict, which includes evidence pertaining to
whether he personally gained from what was allegedly taken, whether he partially
performed on any of the representations that were made to the complainants, whether he
used deception to obtain property, and whether any inferences can properly be drawn from
the combined force of the circumstantial evidence." (19) 

 "The critical distinction between conduct that is criminal versus civil in nature is
whether the record shows deception and not merely a failure to perform." (20) A claim of theft
made in connection with a contract requires proof of more than an intent to deprive the
owner of property and subsequent appropriation of the property. (21) "If no more than intent
and appropriation is shown in a contract claim, nothing illegal is apparent, because under
the terms of [a contract] individuals typically have the right to 'deprive the owner of
property,' albeit in return for consideration." (22) In a contract claim, the State must prove the
defendant did not perform the contract and knew he was not entitled to the money, not
merely that there is a dispute about the amount rightfully owed. (23) The mere fact that one
fails to return funds paid in advance after failing to perform a contract does not constitute
theft. (24) If money was voluntarily given to the appellant pursuant to a contractual agreement
and there is insufficient evidence in the record to show the money was obtained by
deception, the conviction cannot stand. (25) In sum, the State must show a rational factfinder
could have found appellant had no intention of fulfilling his obligation under the agreement,
and his promise to perform was "merely a ruse to accomplish theft by deception." (26) 

Analysis


 By his first issue, appellant contends the evidence is legally insufficient to establish
(1) an unlawful appropriation, (2) a lack of effective consent by reason of deception, and
(3) the requisite "intent to deprive." Appellant argues there was no unlawful appropriation
by means of deception because (1) McGee voluntarily paid funds to him pursuant to the
terms of the construction contract, and (2) McGee's voluntary payments to subcontractors
were unnecessary because no liens had been filed against the property by subcontractors. 
Appellant also argues there is no evidence of the "intent to deprive" element because
McGee admitted that he fired appellant. 

 As noted above, a claim of theft made in connection with a contract requires proof
of more than "intent to deprive" the owner of property and subsequent appropriation
because under a contract, an individual typically deprives the owner of property in
exchange for consideration. (27) Thus, our inquiry must focus on whether there is sufficient
evidence to show that the money McGee paid appellant pursuant to the contract was
obtained by deception. (28)

 At trial, Mr. McGee testified that appellant said he and Carole Wilkinson were
partners in "Wilkinson Reed Development." Wilkinson is a trust officer at the local Stewart
Title office. According to McGee, appellant explained that the construction funds would be
deposited into an account with Stewart Title, and that invoices would be paid by Wilkinson
out of the escrow funds. McGee testified that he believed he had an escrow account at
Stewart Title, an arrangement that "made it legitimate." He also stated that if he had
known that the funds would not be deposited into an escrow account, he would not have
done business with appellant. According to McGee, another reason for his belief that
appellant and Wilkinson were partners was appellant's office sign, which read "Wilkinson
Reed Development."

 McGee testified that he paid appellant five draws totaling $123,700.00 between May
and December 2003. McGee later learned that the first check to appellant had been
deposited into a "Reed Construction Company" account; the four subsequent checks were
simply cashed by appellant. After McGee fired appellant in December, he learned that
many of the vendors from whom appellant had presented invoices had not been paid;
McGee paid the outstanding bills to vendors from his savings, which "cleaned out [his]
savings account." McGee testified that $18,000.00 out of the second and third draw
requests was in payment for windows. After appellant was fired, McGee learned that the
windows had been ordered, but not paid for. When the windows arrived at the glass
company, McGee paid the company directly for the windows. McGee testified that two
draw requests, one for $15,000.00 and a second for $5,500.00, were designated for 
payment to Bracht Lumber Company for cinder block. McGee later learned that despite
the draws, two outstanding invoices from Bracht Lumber, dating back to November 2003,
for a total of $8,118.84, remained unpaid. Similarly, McGee testified that two draws
totaling $15,000.00 were for "Spancrete," a concrete product to be used in the roof. Ronal
Olfers, an employee of the concrete manufacturer, testified that appellant had accepted
the bid proposal for the job, but the product had neither been manufactured nor paid for. 

 McGee testified that he fired appellant in December because appellant gave Manuel
Gonzales, the lead mason in the masonry crew, a $2,500.00 check that "bounced." McGee
learned that although he had paid appellant $14,000.00 out of the third and fourth draws
for mason labor, appellant had only paid out $6,000.00. When McGee called appellant
about the check, appellant said he would make the check good "when he [got] around to 
it." McGee said that was "not acceptable," and paid the masonry crew $2,500.00 out of his
checking account. McGee testified that three days after he gave appellant a draw-request
check, appellant came by the job site driving a new Harley Davidson motorcycle. 

 On cross-examination, McGee admitted that the contract does not contain any
provision regarding an escrow account, but stated he "was just going by what [appellant]
told [him]." 

 Beverly McGee testified that appellant explained that the construction funds (checks
from the McGees) would be deposited into an escrow account with Stewart Title, under the
control of Wilkinson, his partner. As invoices were presented to Wilkinson, she would pay
them from the account. Ms. McGee testified that having the money in an escrow account
"seemed like a safe thing to do," and that had she known the funds were going into a
private account, she would not have agreed to the contract because such a practice did
not make "good business sense." 

 Carole Wilkinson testified that she is an escrow officer at Stewart Title. She testified
that she and appellant had been partners, but that she had "phased out" of the business
when she became an escrow officer at Stewart Title. (29) She testified that her office
researches title on contracts between builders and owners, but does not set up escrow
accounts for purposes of home construction. She testified she had never accepted monies
from appellant for an escrow account for the McGees.

 The State presented testimony from several other witnesses, including Gonzales,
the masonry subcontractor, and the bookkeeper for the glass company. The record
includes a photograph of the job site, depicting several partially-constructed block walls.
Appellant did not testify and did not present any witnesses.

 We note that if a contract is partially or substantially performed, then intent to
commit theft through deception is not shown by the evidence. (30) Here, appellant had
performed some work on the project. However, the evidence before us shows appellant
deceived the McGees by falsely telling them that the construction funds would be
deposited in an escrow account. The McGees testified had they known that the funds
would not be placed in an escrow account, they would not have agreed to the contract. 
The evidence also shows that appellant told McGee that the draws were designated for
particular construction costs, but the funds were not used to pay for the designated
expenses. Specifically, appellant took funds and represented that they were needed to
pay for windows, cinder block, and "spancrete"; the funds, however, were not used for
those purposes. Instead, the first check was deposited in appellant's business account,
and four subsequent checks were cashed. We conclude that the evidence shows that the
proceeds of the checks were not used for the purposes represented by appellant. Viewing
the evidence in the light most favorable to the verdict, we conclude that a rational jury could
have inferred that appellant took the funds without the intent to perform the contract and 
with the intent to deprive the McGees of the funds. We hold the evidence is legally
sufficient to support appellant's conviction and overrule his first issue. 

 By his second issue, appellant contends the evidence is factually insufficient. 
Appellant makes the same arguments in connection with his factual sufficiency complaint. 
Specifically, appellant argues: (1) there was no unlawful appropriation by deception
because the contract did not provide for an escrow account; (2) McGee's payments to
subcontractors were voluntary and unnecessary because no liens were filed against the
property; and (3) there was no proof of the "intent to deprive" element because appellant
was fired and therefore could not complete the project. 

 We note that although appellant cross-examined the State's witnesses, he
presented no evidence during the trial, and there was no conflicting evidence for the jury
to resolve. We have already addressed appellant's arguments in connection with his legal
sufficiency challenge. We further note, however, that we are unpersuaded by appellant's
argument that the contract did not contain any reference to an escrow account because
the McGees testified that appellant told them he would set up an escrow account at
Stewart Title. With respect to appellant's argument that the McGees' payments to the
subcontractors were unnecessary because no liens had been filed, we note that even if the
McGees had not paid the subcontractors, the State presented evidence that appellant
represented that the purpose of the draws was to pay subcontractors, but did not use the
funds for that purpose. As to appellant's argument that he could not perform the contract
because he was fired, we have found that the State presented evidence from which a
rational juror could infer that appellant took the funds without the intent to perform the
contract and with the intent to deprive the McGees of the funds. 

 We have conducted a neutral review of the evidence and find that it is factually
sufficient to support the jury's verdict in this case. We overrule appellant's second issue.

Ineffective Assistance 


 Strickland v. Washington, (31) sets forth the standard of review for effectiveness of
counsel. (32) Strickland requires a two-part inquiry. (33) The defendant must first show that
counsel's performance was deficient, in that it fell below an objective standard of
reasonableness. (34) Second, the defendant must further prove there is a reasonable
probability that but for counsel's deficient performance, the result of the proceeding would
have been different. (35) A reasonable probability is a probability sufficient to undermine
confidence in the outcome. (36) 

 The determination regarding whether a defendant received effective assistance of
counsel must be made according to the facts of each case. (37) An appellate court looks to
the totality of the representation and the particular circumstances of the case in evaluating
counsel's effectiveness. (38) 

 The appellant bears the burden of proving by a preponderance of the evidence that
counsel was ineffective. (39) There is a strong presumption that counsel's conduct fell within
the wide range of reasonable professional assistance. (40) To defeat the presumption of
reasonable professional assistance, "any allegation of ineffectiveness must be firmly
founded in the record, and the record must affirmatively demonstrate the alleged
ineffectiveness." (41) Generally, the record on direct appeal will be insufficient to show that
counsel's representation was so deficient as to meet the first part of the Strickland
standard. (42)

 By his third issue, appellant contends he was denied effective assistance of counsel 
because his trial attorneys did not interview any of the State's witnesses. At the hearing
on appellant's motion for new trial, appellant testified he did not think his attorneys
prepared properly for trial because they did not know what the State's witnesses were
going to say. 

 Appellant's counsel testified that he discussed with appellant whether appellant
should testify at his trial; although appellant made the decision, his counsel recommended
that he not testify for several reasons, including that appellant's story "was not real
consistent." With regard to the State's witnesses, appellant's counsel testified that he and
his co-counsel did talk with some witnesses, but did not contact others because they "had
a pretty good idea in terms of what their testimony was going to be." Counsel stated that
he spoke with three or four character witnesses about appellant's character. Counsel
testified that they discussed calling appellant's civil trial lawyer as a fact witness to testify
that the theft allegation was a civil, not a criminal matter; they did not do so, however,
because such testimony could have "opened the door" to damaging testimony regarding
appellant's business transactions with other customers. Appellant's counsel was asked
whether appellant "[gave] you any witnesses as to the [theft allegation]." Counsel stated
that appellant had not. 

 We conclude that appellant has met neither prong of Strickland. (43) We overrule
appellant's third issue. We affirm the trial court's judgment. 




 

 LINDA REYNA YAÑEZ,

 Justice



Do not publish. Tex. R. App. P. 47.2(b).


Memorandum opinion delivered and filed 

this the 27th day of March, 2008. 
1. See Tex. Penal Code Ann. § 31.03(a), (b), (e)(5) (Vernon Supp. 2007).
2. The trial court also imposed a $10,000 fine and ordered appellant to pay restitution to the
complainants in the amount of $76,310.45.
3. In 1995, the McGees won almost five million dollars in the Texas State Lottery. 
4. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim.
App. 1996).
5. Jones, 944 S.W.2d at 647.
6. Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).
7. Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).
8. Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).
9. See Cain v. State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997); Clewis v. State, 922 S.W.2d 126,
134 (Tex. Crim. App. 1996).
10. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006) (citing Johnson v. State, 23
S.W.3d 1, 11 (Tex. Crim. App. 2000)).
11. Drichas v. State, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005); see Watson, 204 S.W.3d at 414
(stating that a court should not reverse a verdict it disagrees with, unless it represents a manifest injustice
even though supported by legally sufficient evidence).
12. Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).
13. See Tex. Penal Code Ann. § 31.03(a) (Vernon Supp. 2007).
14. See id. at § 31.03(b)(1). 
15. See id. at § 31.01(3)(A).
16. See id. at § 31.01(1)(E). 
17. Wilson v. State, 663 S.W. 2d 834, 836-37 (Tex. Crim. App. 1984 (en banc); Peterson v. State, 645
S.W.2d 807, 811 (Tex. Crim. App. 1983) (op. on reh'g). 
18. King v. State, 174 S.W.3d 796, 810 (Tex. App.-Corpus Christi 2005, pet. ref'd). 
19. Christensen v. State, 240 S.W.3d 25, 32 (Tex. App.-Houston [1st Dist.] 2007, pet. ref'd). 
20. Id. at 34.
21. Jacobs v. State, 230 S.W.3d 225, 229 (Tex. App.-Houston [14th Dist.] 2006, no pet.) (citing Baker
v. State, 986 S.W.2d 271, 274 (Tex. App.-Texarkana 1998, pet. ref'd)). 
22. Id. (quoting Baker, 986 S.W.2d at 274).
23. Id. 
24. Id. 
25. Id. at 229-30 (citing Phillips v. State, 640 S.W.2d 293, 294 (Tex. Crim. App. 1982); Baker, 986
S.W.2d at 274).
26. Id. at 230 (citing King v. State, 17 S.W.3d 7, 15 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd)).
27. Id. at 229.
28. See id. at 229-30.
29. Wilkinson testified that as partners, appellant built houses and she sold them. 
30. Jacobs, 230 S.W.3d at 231-32 (citing Baker v. State, 986 S.W.2d 271, 275 (Tex. App.-Texarkana
1998, pet. ref'd)). 
31. Strickland v. Washington, 466 U.S. 668, 687 (1984).
32. See Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).
33. Id. 
34. Id.
35. Id.
36. Id.
37. Id.
38. Id.
39. Id. at 813.
40. Id.
41. McFarland v. State, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996).
42. Mitchell v. State, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002).
43. See Thompson, 9 S.W.3d at 812.