# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-15-00445-CR

**Ronicesha Cherron Wearren, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 426TH JUDICIAL DISTRICT
### NO. 73,714, HONORABLE FANCY H. JEZEK, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

Ronicesha Cherron Wearren was charged with theft for unlawfully appropriating metal fence panels with the intent to deprive the owner, Juan Rodriguez, of that property. *See* Tex. Penal Code § 31.03(a), (b) (setting out elements of offense of theft). Further, the indictment alleged that the value of the property was between $1,500 and $20,000. *See* Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 1.01, sec. 31.03(e)(4)(A), 1993 Tex. Gen. Laws 3586, 3637-38 (providing that offense is state-jail felony if value of property is between $1,500 and $20,000) (amended 1995, 1997, 2001, 2003, 2007, 2009, 2011, 2015) (current version at Tex. Penal Code § 31.03(e)(4)(A) (specifying that offense is state-jail felony if value of property is more than $2,500 but less than $30,000)). At the end of the guilt-or-innocence phase of the trial, the jury found Wearren guilty of the charged offense. At the conclusion of the punishment phase of the trial, the jury recommended that Wearren be sentenced to 14 months' imprisonment. *See* Tex. Penal Code § 12.35 (setting out

permissible punishment range for state-jail felony). The district court rendered its judgment of conviction in accordance with the jury's verdicts. In two issues on appeal, Wearren challenges the sufficiency of the evidence supporting her conviction. We will affirm the district court's judgment of conviction.

## GOVERNING LAW AND STANDARD OF REVIEW

Under a legal-sufficiency standard of review, appellate courts view the evidence in the light most favorable to the verdict and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When performing this review, an appellate court must bear in mind that it is the factfinder's duty to weigh the evidence, to resolve conflicts in the testimony, and to make reasonable inferences "from basic facts to ultimate facts." *Id.*; *see also* Tex. Code Crim. Proc. art. 36.13 (explaining that "jury is the exclusive judge of the facts"). Moreover, appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Furthermore, appellate courts presume that conflicting inferences were resolved in favor of the conviction and defer to that resolution. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In addition, courts must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The evidence is legally insufficient if "the record contains no evidence, or merely a

2

'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes reasonable doubt." *Id.* at 107 (quoting *Jackson*, 443 U.S. at 320).

Under the relevant provisions of the Penal Code at issue, "[a] person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property." Tex. Penal Code § 31.03(a). An "'[o]wner'" in this context means a person who "has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor," *id.* § 1.07(a)(35)(A), and "'[p]ossession'" is defined as "actual care, custody, control, or management," *id.* § 1.07(a)(39). Moreover, "'[a]ppropriate'" means "to acquire or otherwise exercise control over property other than real property," *id.* § 31.01(4)(B), and appropriation is unlawful if "it is without the owner's effective consent," *id.* § 31.03(b)(1). "'Consent' means assent in fact, whether express or apparent," *id.* § 1.07(a)(11), and "'[d]eprive'" is defined as meaning "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner" or "to dispose of property in a manner that makes recovery of the property by the owner unlikely," *id.* § 31.01(2)(A), (C). "The intent to deprive is determined from the words and acts of the accused." *See King v. State*, 174 S.W.3d 796, 810 (Tex. App.—Corpus Christi 2005, pet. ref'd). When determining whether there was the requisite intent to commit theft, the factfinder can consider whether the defendant obtained a personal benefit from acquiring the property. *Christensen v. State*, 240 S.W.3d 25, 32 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd).

In addition, during the time relevant to this appeal, the Penal Code provided that theft is a state-jail felony if the value of the property is between $1,500 and $20,000. *See* Act of May 29,

3

1993, 73d Leg., R.S., ch. 900, § 1.01, sec. 31.03(e)(4)(A), 1993 Tex. Gen. Laws 3586, 3637-38 (amended 1995, 1997, 2001, 2003, 2007, 2009, 2011, 2015).  Further, the value of stolen property is assessed by using "the fair market value of the property or service at the time and place of the offense" or " if the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the theft."  Tex. Penal Code § 31.08(a).

## DISCUSSION

**Value of the Property**

In her first issue on appeal, Wearren contends that the "evidence is insufficient to support [her] conviction because the State failed to show the fair market value of the property allegedly stolen" even though "that value was readily ascertainable."  Accordingly, Wearren contends that evidence regarding the replacement value of the property could not be considered.  When presenting this issue, Wearren notes that the victim in this case, Rodriguez, testified that he received the fence panels from a friend in exchange for work that he performed on a car and admitted that he did not know whether the fence panels were used or new when he received them.  Further, Wearren highlights that the replacement-cost estimates that Rodriguez testified about were for new fence panels. Similarly, Wearren notes that one of the investigating officers, Officer Justin Kelly, admitted in his testimony that he never contacted the person from whom Rodriguez acquired the property in order to ascertain the value of the panels or obtained a receipt showing how much the panels were worth and admitted that he did not know about the condition of the fence panels on the day of the offense.  In light of the preceding, Wearren contends that the State failed to present legally-sufficient evidence establishing the value of the property taken.

4

For purposes of evaluating the value of property that has been allegedly stolen, fair-market value means the amount of money that "the property would sell for in cash" if the owner was given a reasonable amount of time to sell it. *See Keeton v. State*, 803 S.W.2d 304, 305 (Tex. Crim. App. 1991). The fair-market value of property can be proven, among other ways, through the testimony of an owner's opinion of the value of the property or through evidence of the retail price or sale price. *Id.*; *Ray v. State*, 106 S.W.3d 299, 301 (Tex. App.—Houston [1st Dist.] 2003, no pet.). "When the owner of the property is testifying as to the value of the property, he may testify as to his opinion or estimate of the value of the property in general and commonly understood terms." *Ray*, 106 S.W.3d at 301. In addition, an owner may testify regarding the purchase price or replacement cost and is presumed to be testifying regarding an assessment of the fair-market value. *See Sullivan v. State*, 701 S.W.2d 905, 909 (Tex. Crim. App. 1986); *see also Cox v. State*, No. 03-97-00015-CR, 1998 WL 29881, at *3 (Tex. App.—Austin Jan. 29, 1998, pet. ref'd) (not designated for publication) (explaining that "[a]n owner of property may testify to his or her opinion as to the value of property, without any testimony relative to market value, since an owner who testifies as to value of property is presumed to be testifying as to market value"). Moreover, to rebut an owner's opinion regarding the value of the stolen property, the defendant "must offer controverting evidence as to the value of the property." *Sullivan*, 701 S.W.2d at 909; *see Valdez v. State*, 116 S.W.3d 94, 99 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd).

During the trial, Rodriguez explained that he acquired 20 to 25 fence panels from a friend of his in exchange for some work that he did and that all but two were taken. When describing the work that he did in exchange for the fence panels, Rodriguez related that he worked

5

on his friend's car for two to three months, changed the paint on the vehicle, performed some bodywork, and paid for the materials. Further, he revealed that he had been a mechanic previously and that he would have charged a customer between $5,000 and $7,000 and a friend between $3,000 and $3,500 for the work that he performed in exchange for the panels. *Cf. Cox*, 1998 WL 29881, at *2-3 (noting in evaluation of whether there was sufficient evidence establishing that value of stolen property was greater than $750 that defendant "offered to take the tractor in lieu of the $1,900 contracted agreement" for services that defendant provided to victim). Moreover, he stated that he would have paid $3,000 for the fence panels based on estimates that he obtained from Home Depot and Lowe's for similar fence panels.

In light of the evidence summarized above regarding Rodriguez's estimation of the value of the panels, of the reasonable inferences that could be made from that evidence, and of the presumption that an owner's testimony pertains to the fair-market value of the stolen property and in the absence of any evidence contradicting that value, we must conclude that the evidence is legally sufficient to establish that the fair-market value of the property was between $1,500 and $20,000.

In addition, we note that when he was discussing the efforts that he took to find the missing property, Rodriguez explained that he went to a local scrap-metal facility and that one of the employees confirmed that the panels had been brought to the facility and had already been crushed. Accordingly, the jury could have reasonably determined that the current fair-market value could not be ascertained and, therefore, considered evidence regarding the replacement value of the property. *See* Tex. Penal Code § 31.08(a); *see also MaGee v. State*, 715 S.W.2d 838, 840 (Tex. App.—Houston [14th Dist.] 1986, no pet.) (determining that replacement value was properly considered when property

6

was never recovered and when victim was unable to estimate market value because he did not know age or condition of property).

During the trial, Officer Kelly provided testimony regarding the replacement value of the panels. First, he explained that when he talked to Wearren as part of his investigation, she admitted that she had taken between 15 and 20 panels as well as other items from the property. When describing how he attempted to estimate the value of the property, Officer Kelly admitted, as pointed out by Wearren, that he had no idea of the condition of the panels at the time that they were taken or how old they were. However, Officer Kelly also explained that when he talked with Rodriguez, Rodriguez stated that he received the panels "in trade for work," that he contacted the friend who gave him the panels, and that his friend said that the panels originally came from Lowe's. In addition, Officer Kelly described how he went to the website for Lowe's and found "the closest fence paneling that they had for sale at that particular time," that he showed Rodriguez what he found, and that Rodriguez agreed that those were the types of panels that had been stolen. Furthermore, Officer Kelly explained that the website showed that those panels cost $200 per panel and, accordingly, that the value of the 20 panels that had been stolen was $4,000. Relatedly, he agreed that this amount represented "the fair-market value for what it would take to replace the stolen panels."

In light of the evidence summarized above as well as the reasonable inferences that could be made from that evidence, we must conclude that the evidence is legally sufficient to support a jury determination that the replacement value of the property was between $1,500 and $20,000.

For all of these reasons, we overrule Wearren's first issue on appeal.

7

**Intent to Deprive**

In her second issue on appeal, Wearren acknowledges that she admitted during the trial that she took the panels at issue but asserts that the "evidence is insufficient to support [her] conviction because the State failed to prove [that she] had the intent to deprive anyone of the allegedly stolen property where it appeared that the property had been abandoned." *See Ingram v. State*, 261 S.W.3d 749, 754 (Tex. App.—Tyler 2008, no pet.) (explaining that "it is possible to take possession of abandoned property without committing a theft or intending to commit a theft"); *see also Fernandez v. State*, No. 04-14-00039-CR, 2014 WL 7440883, at *3 (Tex. App.—San Antonio Dec. 31, 2014) (mem. op., not designated for publication) (providing that individual may abandon property that is subject of theft allegation and that abandonment includes intent to forsake property and act by which intention is carried out), *aff'd* 479 S.W.3d 835 (Tex. Crim. App. 2016).

When presenting this issue on appeal, Wearren points to portions of her testimony given during the trial. In particular, Wearren testified that she picks up scrap metal as a way to make money, that she went to the area in question because she thought that it was the neighborhood's trash day, that she saw two panels laying near the road that she assumed had been abandoned due to their proximity to the road, that she saw more panels "scattered among several . . . trees" that had been "propped up to the side like they were being stacked," that she estimated that the panels were 25 to 30 yards from where she picked up the first two panels, and that she gathered the panels and took them to a recycling facility. In addition, Wearren explained that she did not see any dwellings or vehicles on the property, that there were no signs prohibiting entry, and that there was no mailbox on the property. Moreover, she explained that she thought that the property was "[a]n illegal dump

site" and that she did not see anything that made it appear that someone had any plans to do anything with the property. Wearren also testified that when she was collecting the panels, she waved to one of the neighbors across the street.

Further, Wearren points to testimony from Rodriguez in which he testified that he did not live on the property at the time, did not have a house on the property, did not have a mailbox on the property, did not have a no-trespassing sign on his property at the time of the offense, and did not post any type of sign indicating that he was the owner of the property. In addition, Wearren highlights portions of Officer Kelly's testimony in which he testified that when he questioned Wearren, she admitted that she took the panels but explained that she thought that they had been abandoned. Furthermore, Officer Kelly related that Wearren volunteered to take him to the property where she found the panels. Moreover, Wearren notes that Officer Kelly agreed in part of his testimony that the property could have appeared as "vacant land about to be homestead" and that there were no structures or enclosures on the property. Finally, Wearren refers to the testimony of Damien Deville, who was an employee of the facility to which she took the panels. In his testimony, Deville testified that Wearren presented her identification when dropping off the panels and that she continued to bring metal to the facility after this incident.

In light of the preceding, Wearren insists that the evidence established that she thought that the panels had been abandoned and was, therefore, legally insufficient to establish that she had the intent to deprive Rodriguez of his property.

Although Wearren testified that there were fence panels along the road and that the remainder of the panels were 25 to 30 yards from the road, Rodriguez denied that there were any panels on the road and testified that all of the panels were stored approximately 160 feet from the

9

road on the interior of his property. Further, although Wearren testified that she thought the property was an illegal dump site and although Rodriguez agreed that he did not have a home on the property at the time of the offense, Rodriguez also testified that he bought the 5.4-acre lot with the intent to build a house there, that the lot was in a subdivision with houses on either side of his property and across the street, that people were living in those neighboring homes, that his property was the tenth lot in the neighborhood and was approximately a mile from the main road, that his property was fenced on the sides and on the back but not in the front, and that he had been working on the property a few days before the alleged offense. Moreover, he explained that on the property he kept a truck, a backhoe, and a deer blind with a heater, bottles of water, and seats inside, that he placed the fence panels near his truck, and that the panels were stacked leaning against a tree in order to protect them from the elements. In addition, he explained that he had been actively clearing brush and trees from his property and that from his efforts "it was obvious that someone was building or was getting ready to build in the lot." Finally, Rodriguez testified that he did not give anyone permission to enter his land or take the panels, that he never got the property back, and that the panels had been crushed by the recycling facility that Wearren transported the panels to.

In addition, Officer Kelly testified that during his interview with Wearren, she admitted that she had not obtained permission to go onto the property or take the panels. Further, Officer Kelly related that to get to Rodriguez's property, Wearren would have had to drive through the neighborhood and, in doing so, would have seen the developed houses surrounding Rodriguez's property. When describing Rodriguez's property, Officer Kelly disagreed with the assertion that the property looked abandoned and testified that it appeared that people had been on the property recently and that the property did not seem vacant because "it was in a subdivision that has been

10

developed. There are houses on each side of the property. To me it was clearly being constructed at the time. There were tracks [from cars on the ground] and there was equipment on the property."

Similarly, Deputy Jason Davis described the area as a neighborhood subdivision that was "densely populated for a county area" and "fairly high-end" with larger lots, and he also explained that the area was about 90 percent developed with "very few empty open lots" and that there was a sign at the start of the only entrance to the neighborhood containing the name of the subdivision. When discussing his observations of Rodriguez's property, Deputy Davis testified that the property did not have a house on it but had houses on either side of it and that work had been done on the property in an effort to clear the area.[1]

Finally, Deville testified that Wearren was financially compensated for taking the panels to the recycling facility.

Viewed in the light most favorable to the conviction and resolving conflicts in the evidence in favor of the conviction, the evidence establishes that Rodriguez's property was located in a mostly developed neighborhood and had occupied houses surrounding the property, that his property had recently been worked on and visited and did not appear abandoned, that several trees and brush had been cleared out for construction purposes, that the panels were stacked on the property in an attempt to protect them, that the panels were 160 feet away from the road and well within the interior of Rodriguez's property, that Wearren went onto Rodriguez's property and took most of the panels, that she did not have permission to enter the property or take the panels, that

---

[1] During the trial, a video recording of the neighborhood made by the investigating officers was admitted into evidence and played for the jury. The video is generally consistent with the testimonies of the law-enforcement officers describing the neighborhood.

11

she transported the panels to a recycling facility where they were crushed, and that Wearren was financially compensated for taking the panels. In light of this evidence as well as the reasonable inferences that may be drawn from the evidence and given the jury's role in making credibility determinations, we must conclude that there was legally-sufficient evidence establishing that Wearren unlawfully appropriated the fence panels with the intent to deprive Rodriguez of the property. *See Godinez v. State*, No. 08-12-00218-CR, 2014 WL 4639404, at *4 (Tex. App.—El Paso Sept. 18, 2014, no pet.) (not designated for publication) (determining that evidence was legally sufficient to support conviction for theft despite defendant's argument that he did not take anything that was not intended to be thrown away and observing that it was jury's task to determine credibility of witnesses and to resolve conflicts in evidence).

For all of these reasons, we overrule Wearren's second issue on appeal.

## CONCLUSION

Having overruled Wearren's two issues on appeal, we affirm the district court's judgment of conviction.

_____

David Puryear, Justice

Before Justices Puryear, Goodwin, and Bourland

Affirmed

Filed:   July 13,2016

Do Not Publish